**ACOMP**
**MATTHEW Q. CALLISTER, ESQ.**
Nevada Bar No.  001396
mqc@call-law.com
**CALLISTER & ASSOCIATES**
823 Las Vegas Blvd. South
Las Vegas, Nevada 89101
Telephone: (702) 385-3343
Facsimile: (702) 385-2899
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

BOYD BULLOCH; PATRICIA BULLOCH;
CELSA ARENAS; JANET B'AIR;
ENRIQUETA CASTILLO; GEORGE
CASTILLO; LISA FAIRCLOTH; WILLIAM
FAIRCLOTH; LINDA GENTRY;
WENDELL GENTRY; MAYA LEWIS;
ANTHONY LI; CONNIE LI; BRADLEY
MAYS; PHU NGUYEN; LEONARD
PASCUAL; FRANCES RANDOLPH;
MELISSA RANDOLPH; RICHARD
SHELER; SYLVIA THOMPSON-SHELER;
FLORENCE SWICK; SUSAN VAZ;
JEFFREY WELTE; ELENA WOODARD;
ROSS WOODARD; TERESA YAMOMO;

Plaintiffs,

v.

BANK OF AMERICA CORPORATION,
BANK OF AMERICA, NATIONAL
ASSOCIATION, BAC HOME LOANS
SERVICING, LP; RECONTRUST
COMPANY, NA.; FEDERAL HOME LOAN
MORTGAGE CORPORATION;

Defendants.

AND ALL RELATED MATTERS

Case No.:    2:11-cv-00661-JCM -GWF

**FIRST AMENDED CLASS ACTION**
**COMPLAINT**

1. Deceptive Trade Practices
2. Injunctive Relief
3. Promissory Estoppel

COMES NOW, Plaintiff Class Representatives, BOYD BULLOCH, and PATRICIA

BULLOCH, and other named Plaintiffs, CELSA ARENAS, JANET B'AIR, ENRIQUETA

CASTILLO, GEORGE CASTILLO, LISA FAIRCLOTH, WILLIAM FAIRCLOTH, LINDA

GENTRY, WENDELL GENTRY, MAYA LEWIS, ANTHONY LI, CONNIE LI, BRADLEY

MAYS, PHU NGUYEN, LEONARD PASCUAL, FRANCES RANDOLPH, MELISSA

RANDOLPH, RICHARD SHELER, SYLVIA THOMPSON-SHELER, FLORENCE SWICK,

SUSAN VAZ, JEFFREY WELTE, ELENA WOODARD, ROSS WOODARD, and TERESA

YAMOMO, by and through their attorneys, the law firm of Callister + Associates, LLC, and

hereby files this Class Action Complaint against the above named Defendants as follows:

## PARTIES AND JURISDICTION

1.  That at all times hereinafter mentioned, Plaintiff BOYD BULLOCH was and still at all times is a resident of Clark County, Nevada.

2.  That at all times hereinafter mentioned, Plaintiff PATRICIA BULLOCH was and still at all times is a resident of Clark County, Nevada.

3.  That at all times hereinafter mentioned, Plaintiff CELSA ARENAS was and still at all times is a resident of Nye County, Nevada.

4.  That at all times hereinafter mentioned, Plaintiff JANET B'AIR was and still at all times is a resident of Nye County, Nevada.

5.  That at all times hereinafter mentioned, Plaintiff ENRIQUETA CASTILLO was and still at all times is a resident of Clark County, Nevada.

6.  That at all times hereinafter mentioned, Plaintiff GEORGE CASTILLO was and still at all times is a resident of Clark County, Nevada.

7.  That at all times hereinafter mentioned, Plaintiff LISA FAIRCLOTH was and still at all times is a resident of Clark County, Nevada.

8.  That at all times hereinafter mentioned, Plaintiff WILLIAM FAIRCLOTH was and still at all times is a resident of Clark County, Nevada.

9.  That at all times hereinafter mentioned, Plaintiff LINDA GENTRY was and still at all times is a resident of Clark County, Nevada.

10. That at all times hereinafter mentioned, Plaintiff WENDELL GENTRY was and still at all times is a resident of Clark County, Nevada.

11. That at all times hereinafter mentioned, Planitiff MAYA LEWIS was and still at all times

is a resident of Clark County, Nevada.

12. That at all times hereinafter mentioned, Plaintiff ANTHONY LI was and still at all times is a resident of Clark County, Nevada.

13. That at all times hereinafter mentioned, Plaintiff CONNIE LI was and still at all times is a resident of Clark County, Nevada.

14. That at all times hereinafter mentioned, Plaintiff BRADLEY MAYS was and still at all times is a resident of Clark County, Nevada.

15. That at all times hereinafter mentioned, Plaintiff PHU NGUYEN was and still at all times is a resident of Clark County, Nevada.

16. That at all times hereinafter mentioned, Plaintiff LEONARD PASCUAL was and still at all times is a resident of Clark County, Nevada.

17. That at all times hereinafter mentioned, Plaintiff FRANCES RANDOLPH was and still at all times is a resident of Clark County, Nevada.

18. That at all times hereinafter mentioned, Plaintiff MELISSA RANDOLPH was and still at all times is a resident of Clark County, Nevada.

19. That at all times hereinafter mentioned, Plaintiff RICHARD SHELER was and still at all times is a resident of Clark County, Nevada.

20. That at all times hereinafter mentioned, Plaintiff SYLVIA THOMPSON-SHELER was and still at all times is a resident of Clark County, Nevada.

21. That at all times hereinafter mentioned, Plaintiff FLORENCE SWICK was and still at all times is a resident of Nye County, Nevada.

22. That at all times hereinafter mentioned, Plaintiff SUSAN VAZ was and still at all times is a resident of Clark County, Nevada.

23. That at all times hereinafter mentioned, Plaintiff JEFFREY WELTE was and still at all times is a resident of Clark County, Nevada.

24. That at all times hereinafter mentioned, Plaintiff ELENA WOODARD was and still at all

1    times is a resident of Clark County, Nevada.

2
25.  That at all times hereinafter mentioned, Plaintiff ROSS WOODARD was and still at all
3
     times is a resident of Clark County, Nevada.
4
26.  That at all times hereinafter mentioned, Plaintiff TERESA YAMOMO was and still at all
5
     times is a resident of Clark County, Nevada.
6
7    27.  Defendant Bank of America Corporation (hereinafter collectively "Bank of America") is

8         a foreign corporation that is incorporated in Delaware, with its principal place of

9         business located in Charlotte, North Carolina. At all times material to this Complaint,

10        Bank of America was doing business in the State of Nevada. Bank of America

11        Corporation is the parent corporation of Bank of America, National Association.

12   28.  Defendant Bank of America, National Association (N.A.) (hereinafter also collectively

13        "Bank of America") is a national bank with its principal place of business located in

14        Charlotte, North Carolina. At all times material to this Complaint, Bank of America,

15        N,A. was doing business in the State of Nevada. Bank of America NA is the parent of

16        BAC Home Loans Servicing, LP and ReconTrust, N.A.

17   29.  Defendant BAC Home Loans Servicing, LP (hereinafter also collectively "Bank of

18        America") services loans and is a subsidiary of Bank of America with its principal place

19        of business located in Texas. At all times material to this Complaint, BAC Home

20        Loans Servicing, LP was doing business in the State of Nevada.

21   30.  Defendant ReconTrust Company, NA. (hereinafter also collectively "Bank of America")

22        is a wholly-owned subsidiary of Bank of America, NA. that services defaulted

23        mortgages. At all times material hereto, ReconTrust's principal place of business was

24        located in California, and ReconTrust was doing business in the State of Nevada.

25   31.  On July 1, 2008, Bank of America completed its purchase of Countrywide Financial

26        Corporation ("Countrywide"). Since the acquisition, Bank of America has taken over

27

28

servicing loans previously serviced by Countrywide. In addition to the Countrywide loans, Bank of America also services loans for other mortgage investors and loans it originated.

32. That upon information and belief and at all times relevant hereto, Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION is a foreign entity not authorized to conduct business in Clark County, Nevada.

## PROCEDURAL POSTURE

33. The Class, as defined in the Class Action claim, consists of Class A, Subclass A, and Subclass B.

34. Class A consists of Borrowers in the State of Nevada whose first mortgage loans are: (a) serviced or owned by Bank of America; and (b) the loans are delinquent or in imminent risk of default.

35. Subclass A consists of all persons in Nevada who, while in the middle of negotiating either a short sale or a loan modification with Bank of America, had their home sold at a Trustee's Sale.

36. Subclass B consists of all persons in Nevada who are currently negotiating either a short sale or a loan modification with Bank of America and have had Bank of America proceed with the foreclosure process despite these negotiations.

## FACTS

37. Bank of America has made a practice of utilizing deceptive trade practices in their handling of mortgages.

38. Bank of America has done so by:

   (A)    Misleading consumers by promising to act upon requests for mortgage modifications within a specific period of time, usually one or two months, but stranding consumers without answers for more than six months or even a year;

   (B)    Misleading consumers with false assurances that their homes would not be

foreclosed while their requests for modifications were pending, but sending foreclosure notices, scheduling auction dates, and even selling consumers' homes while they waited for decisions;

(C)     Misrepresenting to consumers that they must be in default on their mortgages to be eligible for modifications when, in fact, current borrowers are eligible for assistance;

(D)     Making false promises to consumers that their modifications would be made permanent if they successfully completed trial modification periods, but then failing to convert these modifications;

(E)     Misleading consumers with inaccurate and deceptive reasons for denying their requests for modifications;

(F)     Falsely notifying consumers or credit reporting agencies that consumers are in default when they are not;

(G)     Misleading consumers with offers of modifications on one set of terms, but then providing them with agreements on different sets of terms, or misrepresenting that consumers have been approved for modifications.

39.     Upon information and belief, Bank of America's misconduct in misrepresenting its mortgage modification program was confirmed in interviews with consumers, former employees, and other third parties and through review of relevant documents. Bank of America's own former employees describe an environment in which the Bank failed to staff its modification functions with employees with the training, skills, experience, authority, and information to carry out the Bank's commitments. According to the employees, the modification process was chaotic, understaffed, and not oriented to customers. Bank employees even described being reprimanded for spending too much time with individual consumers.

40.     Because of Bank of America's false promises, many Nevada consumers continued to make mortgage payments they could not afford, running through their savings, their

retirement funds, or their children's education funds. Additionally, due to Bank of America's misleading assurances, consumers deferred short-sales and passed on other attempts to mitigate their losses. And they waited anxiously, month after month, calling Bank of America and submitting their paperwork again and again, not knowing whether or when they would lose their homes. Whatever the consumers' particular circumstances, they all suffered the stress and frustration of being misled by Bank of America while trying to take responsible action to modify their mortgages so they could continue to make their payments and remain in their homes.

41.   Mortgage servicers are hired by the owners of mortgages (or "investors," whether private trusts set up to hold pools or mortgages or government sponsored enterprises, like Fannie Mae or Freddie Mac, which purchase mortgages) to provide services relating to the collection of mortgage payments in return for a servicing fee. These services include negotiations of mortgage modifications of mortgages that are in default, or at risk of default, as well as the processing of foreclosures. Pooling and servicing agreements between the investors and servicers set out the fees and terms for servicing the mortgages, including the manner and circumstances in which the servicer can offer modifications.

42.   In the wake of the financial crisis, Bank of America and other major servicers announced commitments to modify the mortgages of borrowers who are unable (or are unlikely to be able) to make their monthly mortgage payments. In February 18, 2009, the federal government supported and extended these efforts by announcing its initiative, Making Home Affordable, or "MHA" or "HAMP," which provides guidelines and financial incentives for servicers to modify the mortgages of eligible homeowners. By lowering the interest rate on the mortgage, reducing principal, forbearing payments, or extending the terms of home mortgage loans, servicers aim to reach a payment that consumers can afford. Modifications assist homeowners by allowing them to remain in their homes. Modifications also serve the investors by preserving payment streams on the mortgages

1    and by reducing the chance of foreclosures) which often result in significant loss of

2    value.

3  43.  Consumers who receive mortgage modifications enter into new loan agreements with

4    Bank of America.  These agreements are entered into for "consideration of the mutual

5    promises and agreements  exchanged and for good and valuable consideration, the

6    sufficiency of which  is hereby acknowledged." As noted above, Bank of America, like

7    other participating servicers, receive financial payments from the Department of

8    Treasury for each successful modification.  The loan modification agreement  reflects the

9    new terms of the loan, including delinquent  payments, interest and other fees that may

10    be capitalized  into the principal balance of the  loan. In the loan agreement, the borrower

11    also agrees, as consideration for the modification, to deliver any documentation  needed

12    to cure a lost or inaccurate note. The borrower also agrees to provide Bank of America

13    with updated financial information about the borrower that Bank of America  would not

14    otherwise  be entitled to receive.

15
16  44.  Over the last three years, Bank of America repeatedly represented that it would offer

   mortgage modifications to eligible consumers. For example, in Congressional testimony
17
   on July 16, 2009 before the Senate Committee of Banking, Housing, and Urban Affairs, a
18
   Bank of America  executive assured that the Bank: "understands and fully appreciates  its
19
   role in helping borrowers through these difficult economic times.  We  want to ensure
20
   that any borrower who has sufficient income and the intent to maintain homeownership
21
   has the ability to do so using any and all resources we have available. **See, Exhibit "1"**
22
23   **at 3.** As it has in other contexts, Bank of America also promised unequivocally that:

24   "customers will not lose their homes to foreclosure while their loans are being considered

25   for a modification.  The Bank places foreclosure sales on hold while it determines a

26   customer's eligibility for its home retention programs." **See, Exhibit "1" at 6.**

27  45.  Upon information and belief, thousands of Nevada consumers have responsibly reached

28    out to Bank of America to seek either a modification or a short sale.

46.     Bank of America has and, in many cases, continues to:

   a.   Mislead consumers with false promises that it will act on their modifications within a set period of time, but keeps them waiting for months, and sometimes more than a year, beyond the promised term;

   b.   Mislead consumers with assurances that they will not be foreclosed upon while the Bank considered their requests for modifications. However Bank of America has sold the homes of some consumers and sent foreclosure notices to many more while their requests for modifications were still pending;

   c.   Misrepresent to consumers that they must be delinquent on their loans in order to qualify for assistance, even though neither Bank of America's proprietary programs nor the federal HAMP program requires that homeowners have missed payments;

   d.   Mislead consumers with false promises that their initial, trial modifications would be made permanent if and when they made the required three payments on those plans, but then failed to convert those modifications;

   e.   Tell consumers their modifications were denied for reasons that were untrue, such as that: (i) the owner of the loan refused to allow the modification when Bank of America had full authority to modify the loan without the investor's approval; (ii) the Bank had tried unsuccessfully to reach the consumer, even though the consumer repeatedly called the Bank; (iii) the loan was previously modified when it was not; (iv) the borrower failed to make trail payments, when they made all payments; and (v) the borrower was current on his or her loan, when delinquency is not a condition of a modification;

   f.   Falsely notify consumers or credit reporting agencies that consumers are in default when they are not;

   g.   Mislead consumers with offers of modification on one set of terms, and then provide agreements with materially different terms, or inform consumers that

1  their modifications had been approved, but then tell them that their requests were

2  denied often months before.

3  47.  Upon information and belief, the Attorney General's Office also has interviewed

4  numerous former Bank of America call center employees involved in the loan

5  modification or mitigation process. They describe an environment in which Bank of

6  America:

7  a.  Threw inexperienced staff into handling mortgage modifications with little

8  training, direction, or supervision. Said one former employee:

9  In my experience, call center employees received almost no
10  training or direction from Bank of America . . . I and other
   employees frequently complained to our supervisors about our lack
11  of training. Before I was transferred to handle calls relating to
   mortgage modifications, I received no special instruction. I only
12  remember one meeting on the Making Home Affordable program,
   which lasted only ten to fifteen minutes, where they told us to
13  expect more information on the program soon. I did not receive
   any additional information.
14  From time to time, we received new program guidelines and other
   directives by email. On information and belief, many of the
15  people I worked with did not have time to read these emails. The
   direction that we received was often confusing and contradictory.
16  An email would say one thing and then a manager would instruct
   us to do something else.
17
18  Noting that many employees were hired through temporary agencies, another

19  former employee noted:

20  These employees don't receive adequate training on how to use all
   of the computer programs and how to make sure documents don't
21  get lost. The main point of the training is to teach us how to get
   customers off the phone in less than ten minutes.

22
   b.  Frequently misinformed borrowers about the requirements for modifications, the

23  status of their requests, the likelihood of foreclosure, and even the fax numbers to

24  which to send their documents. One former employee reported:

25
   When checking a borrower's status I often found that the
26  modification request had not been dealt with or was so old that the
   request had become inactive. Yet, I was instructed to inform
27  borrowers that they were "active and in status." . . . One time I
   complained to my supervisor, that I felt I was always lying to
28  borrowers.  Her instructions in response were just to give the
   borrowers their status and to tell them that they are "in the

1       process," in spite of the fact that the computer showed that nothing
        was happening.

2

   c. Regularly lost borrowers' paperwork;

3

   d. Failed to communicate with borrowers, and deployed a front line staff without the

4

     authority or information to help borrowers. Said one employee:

5

6       From what I've seen, a borrower can get different explanations
        from every BOA representative, because our supervisors don't
7       make this information clear in training and nobody at BOA seems
        to care what we actually say to the borrower, as long as we get
8       them off the phone.

9   e. Wrongly foreclosed upon borrowers, or failed to stop foreclosures while

10    borrowers' modification requests were pending. One employee described:

11       I often fielded calls from borrowers who had received foreclosure
        notices or been foreclosed upon while they had modification
12       applications pending. Some of the people I spoke with had made
        more than three months of payments on their trial modifications. I
13       also saw borrowers who were foreclosed upon despite being
        current on their modification payments.

14

   f. Reprimanded employees for spending too much time on individual borrowers'

15

    calls.

16

17 48. The experience of Nevada consumers is confirmed by data published each month by the

18   Department of Treasury, which administers HAMP. Bank of America ranks last in

19   virtually every customer service measure catalogued in the Servicer Performance Report

20   (Making Home Affordable Program, available at

21   http://www.financialstability.gov/docs/Oct%202010%20Public%20Final.pdf (Oct.

22   2010)). According to the October 2010 report, Bank of America has the worst customer

23   service metrics for its call centers and the worst time for resolving third-party complaints

24   (e.g., from housing counselors) to the federal government. Bank of America also ranks at

25   the bottom of servicers in its conversion of trial modifications to permanent

26   modifications, and the number of trial modifications that have languished more than six

27   months.

28 49. Upon information and belief, Bank of America has mislead consumers and failed to live

up to its commitments to offer modifications as a result of financial incentives that make it more profitable for Bank of America to delay or deny modifications. For instance, Bank of America earns substantial late fees and other default-related fees, which operates as disincentives to modify mortgages so that borrowers can afford to remain current on their obligations. Moreover, servicing fees are too low to encourage Bank of America and other servicers to provide the level of service required to modify mortgages. Finally, the fact that Bank of America (and other servicers) holds second liens on many of these mortgages may explain their reluctance to pursue certain modifications involving principal forgiveness, which would require them to recognize losses on these second liens.

50. Bank of America's deceptive conduct in offering and providing (or failing to offer and provide) loan modifications, as described above, constitutes a deceptive practice under the Nevada Deceptive Trade Practices Act.

51. On or about November 16, 2006, BOYD BULLOCH and PATRICIA BULLOCH, (hereinafter the "Bullochs") purchased the property located at 821 East Lone Mountain Road, North Las Vegas, Nevada 89081; The loan number for this property is 872322295. The Bullochs' loan is currently owned and/or serviced by Bank of America.

52. Throughout 2009, as a result of the economic downturn, the Bullochs began having difficulty making their monthly mortgage payments.

53. On or about February 10, 2010, the Bullochs received a Notice of Default and Election to Sell.

54. Subsequently, the Bullochs received a letter from Bank of America stating that the Bullochs may be available for a loan modification; the Bullochs contacted Bank of America in regards to obtaining a loan modification shortly after this.

55. On or about March 3, 2010, the Bullochs spoke to Bank of America representative Julius Randall, who informed the Bullochs that they needed to fill out loan modification documents and return them to Bank of America.

1  56.  The Bullochs completed and sent to Bank of America all of the requested documentation.

2  57.  However, the Bullochs did not receive a loan modification, and instead received a Notice

3       of Trustee's Sale on or about August 26, 2010, with a sale date of September 13, 2010.

4  58.  On or about September 3, 2010, Bank of America was contacted, and a Bank of America

5       representative stated that the Bullochs' file was under review, and that a decision should

6       be made in 30-45 days.

7  59.  On or about September 9, 2010, Bank of America was contacted again, and the Bullochs

8       were notified that the sale date was postponed to October 13, 2010.

9  60.  On or about September 15, 2010, Bank of America was contacted again; this time, Bank

10      of America representative Jasmine stated that there was no sale date scheduled.

11 61.  Bank of America was contacted on or about October 1, 2010; Bank of America

12      representative Sharon stated that the Bullochs' loan modification was approved pending

13      investor approval, and that the sale date was postponed to November 15, 2010.

14 62.  On or about November 5, 2010, the Bullochs were notified by Bank of America that the

15      sale date was once again postponed to December 15, 2010; the Bank of America

16      representative also stated that the Bullochs' file was still in review.

17 63.  On or about November 18, 2010, Bank of America again requested that the Bullochs

18      provide them with the required loan modification documents; These documents were

19      provided to Bank of America on or about November 30, 2010.

20

21 64.  In early December 2010, the Bullochs were notified that no sale date was scheduled.

22 65.  Bank of America representative Prentice informed the Bullochs, on or about December

23      17, 2010, that their documentation was available for review, and that no further

24      documentation was needed.

25 66.  However, on or about December 28, 2010, Bank of America was contacted and the

26      Bullochs were told that their loan modification request was cancelled, as the requested

27      loan modification documents were not received; furthermore, a sale date was set for

28      February 17, 2011.

67. On this same day, December 28, 2010, the Bullochs sent all of the required documentation to Bank of America again.

68. On or about January 11, 2011, Bank of America representative Prentice stated that the Bullochs' documentation was received again, however, the documents were not being reviewed yet.

69. Although the Bullochs were in the midst of negotiating with Bank of America in regards to a loan modification, Bank of America continued moving forward with the foreclosure process, and set another sale date for March 21, 2011.

70. Bank of America was contacted yet again on or about March 1, 2011; Bank of America representative LaTonya informed the Bullochs that their file was in review, and that they needed to resend the requested loan modification documents.

71. The Bullochs provided Bank of America with all of the requested loan modification documents on or about March 4, 2011.

72. On or about March 15, 2011, the Bullochs were notified by Bank of America representative Joe that a sale date has been set for April 26, 2011.

73. Bank of America has proceeded with the foreclosure process on the Bullochs home, even though Bank of America is in active negotiations with the Bullochs regarding obtaining a loan modification.

74. On or about March 30, 2005, CELSA ARENAS (hereinafter "Arenas") purchased the property located at 1900 Hassett Drive, Las Vegas, Nevada 89104; The loan number for this property is 22180393. Arenas's loan is currently owned and/or serviced by Bank of America.

75. In or about January 2009, Arenas's monthly mortgage payments were raised; as a result of the increase in what was to be paid each month, along with Arenas experiences financial difficulties, Arenas began having problems making her monthly mortgage payments.

76. Arenas then contacted Bank of America in regards to obtaining a loan modification.

77. Arenas spoke with Bank of America representative Eric Chavez, who provided Arenas with all of the required loan modification documents.

78. Arenas completed all of the required loan modification documents, and provided them to Bank of America as requested.

79. Subsequently, Arenas received a letter from Bank of America stating that she did not qualify for a loan modification.

80. However, in or about October 2009, Arenas was contacted by Bank of America and was told that she did qualify for a loan modification; Arenas received a loan modification trial period plan, which required Arenas to make three consecutive reduced monthly payments, due on November 1, 2009, December 1, 2009, and January 1, 2010.

81. Subsequently, Arenas returned all of the required documentation for the trial period plan and made all of her trial period payments.

82. After not receiving a permanent modification, Arenas contacted Bank of America in this regard.

83. Eventually, Arenas got in contact with Bank of America representative Eddie, who told Arenas that her file was now assigned to Bank of America representative Deborah; Arenas attempted to contact Deborah on multiple occasions, however, was unable to get in contact with her.

84. Furthermore, on or about November 24, 2010, Arenas received a Notice of Default and Election to Sell.

85. After receiving the Notice of Default, Arenas elected to participate in the State of Nevada Foreclosure Mediation Program.

86. Arenas's Foreclosure Mediation took place on or about March 17, 2011, however, the parties were unable to come to a resolution; furthermore, Bank of America failed to bring all of the required documentation to the mediation.

87. Despite Arenas being in the midst of negotiations with Bank of America in regards to obtaining a loan modification, Bank of America has proceeded with the foreclosure

1    process.

2    88.  On or about December 2, 2007, JANET B'AIR (hereinafter "B'air") and FLORENCE

3         SWICK (hereinafter "Swick") purchased the property located at 331 Kenny Avenue,

4         Pahrump, Nevada 89060; The loan number for this property is 174227793. B'air's and

5         Swick's loan is currently owned and/or serviced by Bank of America.

6    89.  Toward the end of 2009, as a result of the economic downturn, and Swick moving out of

7         the home, B'air began having difficulty keeping up with the monthly mortgage payment.

8    90.  Subsequently, B'air began contacting Bank of America in regards to obtaining a loan

9         modification; Bank of America requested that B'air provide them with personal

10        financials and other loan modification documents/forms.

11   91.  In or about February 2010, B'air provided Bank of America with all of the requested loan

12        modification documents.

13   92.  On or about March 22, 2010, B'air received a letter from Bank of America stating that,

14        based upon her financials, no workout options were available.

15   93.  However, one month later, on or about April 22, 2010, B'air received another letter from

16        Bank of America; this time, the letter stated that B'air may be eligible for the HAMP

17        program.

18

19   94.  In response to this, B'air once again sent all of the requested loan modification

20        documents to Bank of America.

21   95.  Although B'air's file was being reviewed for a loan modification, and B'air was currently

22        negotiating with Bank of America in regards to obtaining a loan modification, B'air

23        received a Notice of Default and Election to Sell on or about May 3, 2010.

24   96.  Furthermore, on or about May 26, 2010, B'air received another letter from Bank of

25        America; The letter stated that Bank of America was still missing some of the

26        documentation.

27   97.  On or about June 4, 2010, B'air once again provided Bank of America with all of the

28        requested loan modification documents.

98. On or about September 1, 2010, B'air attended her scheduled home loan mediation, as required under Nevada Assembly Bill 149.

99. At the mediation, Bank of America failed to bring all of the required documentation.

100. However, the mediator issued a Mediator Statement, stating that the parties had come to a resolution; the parties agreed that a short sale could be pursued and that B'air could provide Bank of America with updated loan modification documents.

101. On or about December 15, 2010, B'air was notified by Bank of America that her file was still under review.

102. Despite being in the midst of negotiations with Bank of America in regards to obtaining a loan modification or, in the alternative, pursuing a short sale, Bank of America proceeded with the foreclosure process.

103. On or about August 15, 2006, GEORGE CASTILLO and ENRIQUETA CASTILLO, (hereinafter the "Castillos") purchased the property located at 5990 McLeod Drive, Las Vegas, Nevada 89120; The loan number for this property is 131305019. The Castillos' loan is currently owned and/or serviced by Bank of America.

104. In 2009, as a result of the economic downturn, and George Castillo being diagnosed with Pulmonary Fibrosis, the Castillos began having difficulty making their monthly mortgage payment.

105. Subsequently, the Castillos began contacting Bank of America in regards to obtaining a loan modification.

106. On or about August 4, 2010, Bank of America representative Raul notified the Castillos that their file has been assigned to a negotiator and that the Castillos file is under review.

107. Despite the Castillos being in the midst of negotiations with Bank of America in regards to obtaining a loan modification, Bank of America has continued with the foreclosure process.

108. On or about August 25, 2006, LISA FAIRCLOTH and WILLIAM FAIRCLOTH, (hereinafter the "Faircloths") purchased the property located at 7540 Florine Ave, Las

Vegas, Nevada 89129; The loan number for this property is 141219497. The Faircloths' loan is currently owned and/or serviced by Bank of America.

109. In or around June 2008, Lisa Faircloth was let go from her job due to the company going out of business; Lisa Faircloth had been the primary source of income for her family.

110. Since then, Lisa Faircloth has been unable to find steady work or a steady income.

111. The Faircloths could not afford to pay their mortgage any longer.

112. The Faircloths tried to make the payments for a couple of months and eventually fell behind.

113. The Faircloths first called to discuss loan modification in or about June 2008 and were told that since they were current on their payments, there was nothing that could be done to help them.

114. Starting in April 2009, Bank of America was called on a regular basis in order to obtain a loan modification.

115. All Bank of America would tell the Faircloths was that "the case is in review."

116. The Faircloths were finally scheduled for a mediation on February 1, 2010, almost a year after they contacted Bank of America.

117. At the mediation, the Faircloths were told that they qualified for HAMP, but that their loan could not be extended because in-house guidelines overrode the federal law.

118. Nothing was accomplished at the Faircloths' mediation with Bank of America.

119. Bank of America continued to negotiate with the Faircloths in an attempt to obtain a loan modification.

120. Throughout 2010, at the request of Bank of America, the Faircloths sent the required loan modification documentation to Bank of America multiple times.

121. However, Bank of America repeatedly stated that documentation was not received, and that it would need to be re-sent.

122. On or about January 14, 2011, Bank of America was contacted regarding the Faircloths' home, and Bank of America once again requested more documentation, which was sent

1    via email.

2    123. On January 24, 2011, Bank of America stated that all of the required documentation was
3        received, and that the file was in review.

4    124. Despite being in the middle of negotiations with Bank of America regarding a loan
5        modification, Bank of America went ahead with the foreclosure process on the
6        Faircloths' home.

7    125. On or about October 26, 2006, WENDELL GENTRY and LINDA GENTRY (hereinafter
8        the "Gentrys") purchased the property located at 5306 Hickam Ave., Las Vegas, Nevada
9        89130; The loan number for this property is 870598516. The Gentrys' loan is currently
10       owned and/or serviced by Bank of America.

11   126. Throughout 2009, as a result of the economic downturn and Affiant suffering two heart-
12       attacks, the Gentrys began having difficulty making their monthly mortgage payment.

13   127. Shortly thereafter, the Gentrys began contacting Bank of America in regards to obtaining
14       a loan modification; however, Bank of America was unwilling to help the Gentrys.

15   128. On or about May 11, 2010, the Gentrys received a Notice of Default and Election to Sell.

16   129. Subsequently, Bank of America requested that the Gentrys provide them with loan
17       modification documents and financial information; the Gentrys provided all of the
18       requested documentation to Bank of America each time it was requested.
19

20   130. The Gentrys called Bank of America every few weeks to determine the status of their
21       file; Bank of America informed them every time that they were still in foreclosure, but no
22       sale date was set.

23   131. After receiving the Notice of Default, the Gentrys elected to participate in the State of
24       Nevada Foreclosure Mediation Program.

25   132. In or about September 2010, the Gentrys provided all of the required documentation to
26       both the assigned mediator and the trustee; it was confirmed by both that all of the
27       documentation was received.

28   133. At the foreclosure mediation, the parties came to an agreement, and the Gentrys were

Page 19 of 50

1    assured that they would not lose their home; as part of the agreement, the Gentrys were to

2    provide more documentation to Bank of America.

3  134.  The Gentrys provided the requested documentation to Bank of America on or about

4    December 7, 2010.

5  135.  On or about January 2, 2011, the Gentrys contacted Bank of America and were told that

6    their file was still in review, and that no further documentation was required.

7  136.  In or about April 2011, the Gentrys received a letter from Bank of America stating that

8    their modification was denied, as the requested documentation was not received.

9  137.  On or about April 14, 2011, Affiant and his once again sent all of the requested

10    documentation to Bank of America.

11  138.  Despite the Gentrys being in the midst of negotiations with Bank of America in regards

12    to obtaining a loan modification, Bank of America proceeded with the foreclosure

13    process.

14  139.  Furthermore, the Gentrys were told on numerous occasions that all of the documentation

15    was received, only to be told weeks later, the complete opposite.

16

17  140.  On or about May 15, 1998, MAYA LEWIS (hereinafter "Lewis") purchased the property

18    located at 9909 Garamound Avenue, Las Vegas, Nevada 89117; The loan number for this

19    property is 005741052. Lewis's loan is currently owned and/or serviced by Bank of

20    America.

21  141.  Beginning in 2007, and throughout the next few years, Lewis experienced financial

22    difficulties, and as a result, began having problems making her monthly mortgage

23    payment.

24  142.  Subsequently, Lewis contacted Bank of America in regards to obtaining a loan

25    modification.

26  143.  Lewis provided Bank of America with all of the required loan modification documents,

27    however, Bank of America would not give her a loan modification.

28  144.  On or about September 22, 2009, Lewis received a Notice of Default and Election to Sell.

145. After receiving the Notice of Default, Lewis elected to participate in the State of Nevada Foreclosure Mediation Program.

146. On or about December 8, 2010, Lewis attended the foreclosure mediation; At the medation, the parties agreed to a loan modification, provided Lewis would provide Bank of America with proof of an Intent to Reaffirm the mortgage debt and proof of income.

147. Lewis provided Bank of America with all of the requested additional documentation/proof.

148. However, Bank of America has still refused to approve Lewis for a loan modification.

149. Despite Lewis being in the midst of negotiations with Bank of America in regards to obtaining a loan modification, Bank of America has proceeded with the foreclosure process.

150. On or about September 18, 2006, ANTHONY LI and CONNIE LI, (hereinafter the "Lis") purchased the property located at 92 Laying Up Court, Las Vegas, Nevada 89148; The loan number for this property is 131830540. The Lis' loan is currently owned and/or serviced by Bank of America.

151. As a result of the economic downturn, the Lis began having problems keeping up with their monthly mortgage payment.

152. In the beginning of 2009, the Lis contacted Bank of America in an attempt to get a loan modification, however, Bank of America told the Lis that they must first be in default before Bank of America could help them; The Lis followed Bank of America's advice, and fell behind on their payments.

153. Subsequently, the Lis sent all of the required documentation requested by Bank of America; however, Bank of America has been unwilling to negotiate or approve the Lis for a modification.

154. Bank of America has continually requested repeat documentation, which the Lis have provided to them at every request.

155. In or about September 2010, the Lis received a Notice of Default and Election to Sell.

156. A mediation was held on January 20, 2011, however, no agreement was reached.

157. Subsequently, Bank of America again began negotiating with the Lis in regards to a loan modification.

158. On or about April 6, 2011, the Lis once again re-sent all of the required documentation to Bank of America in an attempt to get a loan modification.

159. Despite being in the midst of negotiations with Bank of America, Bank of America has proceeded with the foreclosure process, setting a sale date for April 26, 2011.

160. On or about August 2, 2007, BRADLEY MAYS, (hereinafter "Mays") purchased the property located at 2521 Illumination Bay Place, Laughlin, Nevada 89029; The loan number for this property is 172800226. Mays's loan is currently owned and/or serviced by Bank of America.

161. By mid-2008, as a result of the economic downturn, Mays began having difficulties making his monthly mortgage payment.

162. In the beginning of 2009, Mays began negotiating a loan modification with Bank of America.

163. In August of 2009, Bank of America informed Mays that he qualifies for a new interest rate and payment; Bank of America tells Mays to give them 90 days for a new payment book to issue.

164. Between August of 2009 and October of 2009, Mays called Bank of America over ten times to confirm the loan modification; Bank of America kept telling Mays that everything was okay and the loan modification was being processed.

165. On or about December 23, 2009, Mays received a Notice of Default and Election to Sell.

166. Mays continued to contact Bank of America in regards to his loan modification, but did not receive any answers.

167. Mays again attempted to obtain a loan modification from Bank of America.

168. On or about July 8, 2010, Mays received a letter from Bank of America stating that Mays is not being considered for a HAMP loan modification because he previously rejected an

1      already offered modification.

2   169.   However, on or about September 30, 2010, Mays received yet another letter from Bank

3          of America stating that he was approved for a loan modification, and that Mays must

4          return the required documentation by October 14, 2010; Mays returned the required

5          documentation by October 14, 2010.

6   170.   On or about November 19, 2010, Mays received a letter from Bank of America stating

7          that Bank of America had not received the required documentation, and that as a result,

8          Mays would not be getting a loan modification.

9   171.   On or about December 31, 2010, Mays received a letter from Bank of America stating

10         that Bank of America has received Mays's last installment due under a Special

11         Forbearance Plan, and that Mays's account is now current.

12  172.   However, *that same day*, December 31, 2010, Mays received a Notice of Intent to

13         Accelerate, with a reinstatement amount of $50,340.65.

14  173.   On or about February 22, 2011, Mays received another Notice of Default and Election to

15         Sell.

16  174.   Despite being in the middle of negotiations with Bank of America regarding a loan

17         modification, Bank of America is proceeding with the foreclosure process.

18

19  175.   On or about December 8, 2006, PHU NGUYEN, (hereinafter "Nguyen") purchased the

20         property located at 9838 Delta Lake Court, Las Vegas, Nevada 89148; The loan number

21         for this property is 153536594. Nguyen's loan is currently owned and/or serviced by

22         Bank of America.

23  176.   As a result of the economic downturn, Nguyen began having problems making his

24         monthly mortgage payment.

25  177.   In or about June 2008, Nguyen retained a third party modification company to help him

26         obtain a loan modification.

27  178.   Upon information and belief, Nguyen, and the company he had retained to help him get a

28         loan modification, were told by Bank of America on numerous occasions that his file was

1    in review, and he would be hearing from them within 45 days.

2 179. However, on or about September 25, 2009, Nguyen's home was sold at a trustee's sale to

3    Defendant Federal Home Loan Mortgage Corporation.

4 180. Federal Home Loan Mortgage Corporation is a necessary and indispensable party

5    because they unfortunately purchased Nguyen's property which was wrongfully

6    foreclosed upon by Bank of America.

7 181. Nguyen contacted Bank of America numerous times to find out why his home was sold

8    while he was in negotiations on a loan modification, but received no answers from Bank

9    of America.

10 182. However, even after his home was already sold at a trustee's sale, Nguyen received a

11    letter on or about December 7, 2009 from Bank of America stating that he would not

12    qualify for a loan modification as a result of his financial situation.

13 183. Despite being in the middle of negotiations with Bank of America regarding a loan

14    modification, Nguyen received conflicting information regarding the status of his

15    modification, and had his home sold at a trustee's sale.

16 184. On or about December 9, 2004, LEONARD PASCUAL, (hereinafter "Pascual")

17    purchased the property located at 4171 Mita Way, Las Vegas, Nevada 89141; The loan

18    number for this property is 69949408. Pascual's loan is currently owned and/or serviced

19

20    by Bank of America.

21 185. As a result of the economic downturn, Pascual began having problems keeping up with

22    his monthly mortgage payment.

23 186. On or about February 6, 2008, Pascual received a Notice of Default and Election to Sell.

24 187. Subsequently, Pascual began contacting his lender in regards to obtaining a loan

25    modification.

26 188. On or about May 1, 2008, Pascual received a Notice of Trustee's Sale.

27 189. Pascual continued negotiating with Bank of America in regards to obtaining a loan

28    modification.

190. In early 2009, Pascual received a loan modification trial period plan, which required Pascual to make three consecutive reduced monthly payments, due on August 16, 2009, October 1, 2009, and November 1, 2009.

191. On or about August 13, 2009, Pascual contacted Bank of America and spoke to Bank of America representative Lionel, who gave Pascual a grace period in which to make the first trial payment.

192. Subsequently, Pascual made all of this trial period payments.

193. After not receiving a permanent modification, Pascual contacted Bank of America in this regard.

194. Pascual received a letter from Bank of America dated January 14, 2010, stating that they were currently reviewing his file for a loan modification.

195. However, on or about January 23, 2010, Pascual received a letter from Bank of America stating that Bank of America had received four out of the five trial period payments, and that the last trial period payment would be due on or before January 31, 2010; Pascual was confused as to this letter, as the trial period plan required only three payments.

196. Then, on or about January 29, 2010, Pascual received a letter from Bank of America stating that they did not have all of the required loan modification documents, and that Pascual would have to provide them to Bank of America immediately; Pascual did so.

197. However, Pascual never received a loan modification.

198. Whenever Pascual would contact Bank of America in regards to a loan modification, he was consistently told that his file was in review.

199. On or about December 10, 2010 Pascual received a letter from Bank of America stating that a loan modification on his mortgage isn't an option, and that he may be eligible for a short sale.

200. Subsequently, Bank of America once again requested that Pascual provide them with financial documentation and forms; Pascual provided Bank of America with these documents and forms on or about December 27, 2010.

201. In the beginning of 2011, Bank of America began negotiating with Pascual once again regarding a loan modification; Pascual was required to provide more documentation to Bank of America, which he did.

202. Despite Pascual being in the midst of negotiations with Bank of America in regards to obtaining either a loan modification or a short sale, Bank of America proceeded with the foreclosure process on Pascual's home.

203. On or about May 19, 2006, MELISSA RANDOLPH and FRANCES RANDOLPH, (hereinafter the "Randolphs") purchased the property located at 4209 Agosta Luna Place, Las Vegas, Nevada 89135; The loan number for this property is128111836.  The Randolphs' loan is currently owned and/or serviced by Bank of America.

204. As a result of the economic downturn, the Randolphs began having problems keeping up with their monthly mortgage payment.

205. In or around November 2009, the Randolphs contacted Bank of America regarding a loan modification; Bank of America told the Randolphs that they must first be in default before they could be considered for a loan modification.

206. At the direction of Bank of America, the Randolphs stopped paying their monthly mortgage payment.

207. Bank of America requested loan modification documents from the Randolphs, which the Randolphs sent to Bank of America.

208. In or about March 2010, the Randolphs received a Notice of Default and Election to Sell.

209. The Randolphs attended a mediation with Bank of America on April 16, 2010, and the parties came to an agreement.

210. At the mediation, it was agreed that the Randolphs would supply Bank of America with an updated T4506 schedule, and that Bank of America would obtain a final approval for a HAMP loan modification.

211. Although the Randolphs complied with the agreement by sending Bank of America the updated T4506 schedule, the Randolphs have yet to receive either a final approval or a

1   denial.

2   212.   Despite being in the midst of negotiations with Bank of America regarding a loan

3          modification, Bank of America has proceeded with the foreclosure process.

4   213.   On or about June 11, 2007, RICHARD SHELER and SYLVIA THOMPSON-

5          SHELER(hereinafter the "Shelers") purchased the property located at 3601 Cottage

6          Wood Street, Laughlin, Nevada 89029; The loan number for this property is 162959053.

7          The Shelers' loan is currently owned and/or serviced by Bank of America.

8   214.   In the beginning of 2009, as a result of the economic downturn, the Shelers began having

9          difficulty making their monthly mortgage payment.

10  215.   Shortly thereafter, the Shelers began contacting Bank of America in regards to obtaining

11         a loan modification.

12  216.   The Shelers provided Bank of America with all of the requested financial and loan

13         modification documents.

14  217.   On or about July 22, 2009, the Shelers once again sent financial and loan modification

15         documents to Bank of America.

16
17  218.   On or about July 24, 2009, the Shelers received a letter from Bank of America stating

18         that based upon a review of their file, the Shelers may qualify for a HAMP loan

19         modification.

20  219.   Subsequently, the Shelers were approved for a HAMP Trial Period Plan.

21  220.   On or about August 17, 2009, the Shelers provided Bank of America with all of the

22         required loan modification documents, including the Trial Plan documents.

23  221.   Accordingly, the Shelers were to make three reduced payments, on September 1, 2009,

24         October 1, 2009, and November 1, 2009, in order to qualify for a permanent

25         modification.

26  222.   On or about September 1, 2009, the Shelers were contacted by Bank of America, who

27         requested that the Shelers provide more financial documentation to Bank of America; the

28         Shelers provided the requested documentation that same day.

223. On or about September 15, 2009, the Shelers were once again contacted by Bank of America, requesting additional documents; once again, the Shelers complied with Bank of America's request and provided the documents.

224. On or about September 28, 2009, the Shelers were told by Bank of America that they would need to re-send the same documentation that they had sent on September 15, 2009; no reason was given for needing this documentation again, however, the Shelers complied anyways and provided the requested documentation that same day.

225. On or about February 27, 2010, the Shelers received a letter from Bank of America, stating that all of their Trial Payments and documents had been received, and that the Shelers were now eligible for a permanent modification; Bank of America requested that the Shelers send in the final documentation, including the loan modification agreement, by March 9, 2010.

226. The Shelers provided Bank of America with all of the requested documentation on or before March 9, 2010.

227. However, after the Shelers completed everything that was asked of them by Bank of America, Bank of America offered them a permanent loan modification which did not lower their monthly payment but instead raised their monthly payment.

228. For over eight months, Bank of America representatives continually misrepresented the modification program, and promised lower payments; the Shelers never received what was promised to them.

229. The Shelers were then informed by Bank of America that they would not be able to apply for another loan modification for one year; however, Bank of America then began negotiating with the Shelers in regards to a special forebearance plan.

230. On or about November 30, 2010, the Shelers received a Notice of Default and Election to Sell.

231. Subsequently, the Shelers elected to participate in the State of Nevada Foreclosure Mediation Program.

232. On or about April 4, 2011, the Shelers attended the foreclosure mediation, however the parties were unable to come to a resolution; the mediator did, however, state that the Shelers could provide updated financials to Bank of America after the mediation.

233. Despite being in the midst of negotiations with Bank of America in regards to obtaining a loan modification, Bank of America proceeded with the foreclosure process.

234. On or about March 19, 2009, SUSAN VAZ, (hereinafter "Vaz") purchased the property located at 3239 Duneville Street, Las Vegas, Nevada 89146; The loan number for this property is 197354777. Vaz's loan is currently owned and/or serviced by Bank of America.

235. Approximately three months after Vaz purchased her home, the company she worked for filed bankruptcy and as a result, Vaz lost her job.

236. Losing her job and having no income at the time caused Vaz to experience extreme financial difficulties.

237. After losing her job, Vaz immediately contacted Bank of America on or about June 23, 2009 to inquire into obtaining a loan modification; a representative of Bank of America informed Vaz that they could not help her, as she needed to be several months behind on her payments before she would qualify for any loan modification programs.

238. Vaz then stated that she would likely be behind on her payments very soon, as she was only going to be receiving weekly unemployment; the Bank of America representative informed Vaz that she would still not qualify for any programs, as unemployment was still considered an "income," and that she definitely needed to be behind on her payments.

239. In or about July 2009, Vaz contacted Bank of America again, informing them that she had obtained another job, and again inquiring into whether she could get a loan modification; the Bank of America representative again told Vaz that they could not help her, as she was still current on her monthly mortgage payments.

240. In or about December 2009, Vaz could no longer make her monthly mortgage payments.

241. In or about January 2010, Bank of America contacted Vaz in regards to her missed payments; at that point, Vaz again requested assistance in obtaining a loan modification.

242. In or about February 2010, Vaz finally received a packet of documents from Bank of America in regards to a loan modification, which Vaz was to fill out and return.

243. Vaz completed all of the forms, and returned everything Bank of America was requesting.

244. However, in or about April 2010, Vaz received a letter from Bank of America stating that she did not qualify for a loan modification because she did not return all of the required documentation.

245. On or about May 5, 2010, Vaz received a Notice of Default and Election to Sell.

246. At this point, Vaz was informed that Bank of America representative William Rinehart was assigned to her file; Vaz attempted to call Mr. Rinehart many times, however, Vaz never received a return call.

247. Vaz was then contacted by another Bank of America representative, who requested that Vaz once again complete and return all of the loan modification documents and forms; Vaz complied and sent Bank of America all of the requested documentation.

248. Additionally, Vaz sent in the required documentation and fees to participate in the State of Nevada Foreclosure Mediation Program.

249. On or about May 19, 2010, Vaz spoke with Bank of America representative Georgette, who told Vaz that she should call in every month to check on the status of her loan modification.

250. On or about June 3, 2010, Vaz received a letter from Bank of America stating that her home was about to be foreclosed upon.

251. However, on or about June 7, 2010, Vaz contacted Bank of America and was told that her file was still under review.

252. On or about June 15, 2010, Vaz again contacted Bank of America; Again, Vaz was told that her file was under review.

253. On or about June 22, 2010, Vaz spoke with Bank of America representative Barbara, who requested that Vaz *again* provide Bank of America with the loan modification documents and forms; once again, Vaz filled out and sent Bank of America all of the requested documentation.

254. On or about July 9, 2010, Vaz spoke with Bank of America representative Robin, who informed Vaz that her file was in underwriting for review.

255. In or about August, 2010, Vaz received a letter from Bank of America informing her that they had received Vaz's request for assistance and personal financial information; the letter stated that Vaz needed to continue making her monthly mortgage payments.

256. The next day, Vaz called Bank of America in regards to the letter she had just received, and was told not to send in any money to Bank of America, as her home was in foreclosure and also being reviewed for a loan modification.

257. On or about August 25, 2010, Vaz attended her scheduled home loan mediation, as required under Nevada Assembly Bill 149.

258. At the mediation, it was noted by the mediator that the parties had resolved the matter; It was agreed between Vaz and Bank of America that Vaz would get a temporary loan modification, while Bank of America reviewed documentation.

259. Vaz was also told that Bank of America would be sending her final documentation, which would need to be signed and returned; Vaz never received such documentation.

260. Instead, in or about September 2010, Vaz received a letter from Bank of America requesting, once again, that Vaz send in the required loan modification documents; Vaz was also informed that her file was again reassigned to a different workout negotiator.

261. At this point, Vaz contacted both the mediator and the Bank of America representative who attended the mediation, in an attempt to find out why she hadn't received the documents she was told she would be getting; Vaz was not given an answer, she was only told to keep trying to call Bank of America.

262. In or about November 2010, Vaz attempted to call Bank of America representative Clay

Carrol, who was assigned to her file, on multiple occasions; However, Vaz could not get in contact with him.

263. Despite not being able to get a return call from Bank of America representative Clay Carrol, Vaz received calls from other representatives requesting that she provide Bank of America with updated documentation; Again, Vaz provided Bank of America with all of the requested documentation.

264. In or about January 2011, Vaz was once again contacted by a Bank of America representative, who requested that Vaz provide an affidavit of hardship; Vaz immediately faxed the affidavit of hardship to Bank of America.

265. On or about February 16, 2011, Vaz was informed that her file was once again assigned to a new Bank of America representative, Gwendolyn Thomskin; Vaz contacted Thomskin and was informed that her file was still under review, and that Vaz should be in a "trial forbearance" soon.

266. On or about February 24, 2011, Vaz received a call from Bank of America representative Kip Payner, who informed Vaz that she "was at the end."

267. Bank of America representative Kip Payner told Vaz that she did not qualify for any loan modification programs, and that her monthly mortgage payment would be increased by $200 each month.

268. Shortly after this conversation, Vaz received a letter from Bank of America simply stating that Vaz did not qualify, and that her loan is in foreclosure; No reason was given as to why Vaz did not qualify for a loan modification.

269. In or about March 2011, Vaz once again called Bank of America, and was told that her file was reassigned once again, this time to Bank of America representative Kevin James.

270. Vaz called Bank of America representative Kevin James, and was told to send in updated financials to Bank of America within 48 hours; Vaz did as directed and sent in all of the requested documentation to Bank of America immediately.

271. However, Vaz never received any loan modification.

272. Vaz has been consistently told to send in documentation to Bank of America, however, when Vaz does so, she is just told that she needs to send in all of the documentation again, and again, and again.

273. Throughout the past few years, Vaz has been told one thing by Bank of America, only to be told another thing a few weeks later; Vaz's file has been reassigned multiple times, and each time she was informed that her file was still under review.

274. Despite being in the midst of negotiations with Bank of America, Bank of America has continued to proceed with the foreclosure process.

275. Additionally, Vaz has never received an explanation of why Bank of America says she does not qualify for a loan modification.

276. On or about September 14, 2006, JEFFREY WELTE (hereinafter "Welte") purchased the property located at 6561 Ashley Vale Street, Las Vegas, Nevada 89131; The loan number for this property is 146735610. Welte's loan was originally owned and/or serviced by Countrywide, but is currently owned and/or serviced by Bank of America.

277. In early 2008, as a result of the economic downturn, Welte began experiencing difficulty making his monthly mortgage payment; Welte contacted Countrywide in an attempt to obtain a loan modification shortly after this.

278. Welte was told that in order to get a loan modification, Welte would first need to miss three monthly mortgage payments; Welte stopped making his payments per Countrywide's advice.

279. However, Welte then contacted Countrywide and was told that in order for Welte to be considered for a loan modification, he would need to pay the same missed payments Countrywide told him not to pay.

280. Welte was then informed that he should look into short-selling his home; Welte sent Countrywide the offers he had received in regards to a short sale, however, Countrywide denied the offers.

281. Countrywide then advised Welte that the only way Welte could obtain a loan

1    modification was by first filing for bankruptcy, which Welte did pursuant to
2    Countrywide's advice.

3    282.   Countrywide informed Welte that once the bankruptcy proceeding was completed,
4          Countrywide would send Welte a modification package to fill out.

5    283.   On October 6, 2008, Welte was pre-qualified over the phone for a loan modification.
6          Welte was told that he would receive the loan modification package within a couple of
7          weeks.

8    284.   Welte did not receive any loan modification package, so he contacted the lender again on
9          October 23, 2008. Welte was told to follow up in a few weeks.

10   285.   Again, Welte did not receive any documentation, so he contacted the lender on
11         November 3, 2008 and was told to be patient and follow up in a few weeks.

12   286.   By November 19, 2008, Welte had still not received a loan modification package, so he
13         contacted the lender and explained the situation; Welte was told to follow up in a few
14         weeks.

15   287.   On December 11, 2008, Welte again contacted the lender and stated that he had received
16         no loan modification documents; a representative told Welte to fax documents to the
17         lender, which Welte did while on the phone with the representative.
18

19   288.   Welte was again told that he would receive a loan modification package within a few
20         weeks, but instead received a Notice of Trustee's Sale.

21   289.   Welte contacted the lender in regards to the Notice of Trustee's Sale and was told that
22         they would rescind the Notice; however, the Notice of Trustee's Sale was not rescinded,
23         it was only postponed.

24   290.   Welte was told that the sale would be postponed, and that in the meantime, Welte would
25         be receiving a loan modification package.

26   291.   Finally, on or about February 13, 2009, Welte received a package from the lender.

27   292.   However, the modification package Welte received added approximately $103,000.00 to
28         the principal balance.

293. Welte received similar documentation in or about May 2009, adding approximately $133,000.00 to the principal balance.

294. Welte was further informed in May 2009 that he would need to make three trial payments in order to be considered for a loan modification.

295. However, in July 2009, the trial payments were changed, and the amount of the payments were raised.

296. Throughout this whole process, Welte has been in negotiations with Countrywide, and subsequently Bank of America, in regards to a loan modification or short-sale; however, Bank of America has continued its foreclosure proceedings while negotiating with Welte.

297. On or about February 3, 2006, ELENA WOODARD, (hereinafter "Woodard") purchased the property located at 7528 Royal Crystal Street, Las Vegas, Nevada 89149; The loan number for this property is 124715000. Woodard's loan is currently owned and/or serviced by Bank of America.

298. As a result of the economic downturn, Woodard's income was reduced significantly, making it extremely difficult for her make her monthly mortgage payment.

299. On or about May 1, 2008, Woodard began contacting Bank of America in regards to obtaining a loan modification; Woodard was told that there was nothing they could do to help her.

300. On or about June 2, 2008, Woodard once again contacted Bank of America; This time, Bank of America requested that Woodard provide them with financial documents, which Woodard provided within a few days.

301. On or about June 16, 2008, Woodard was informed that she was currently being reviewed for a loan modification.

302. On or about August 4, 2008, Woodard called Bank of America to get the status of her loan modification; Woodard was told that there were no programs available for her, but that a new program would be established in December 2008, and she may qualify for that.

303. Accordingly, Woodard called once again on December 10, 2008 and was told that she needed to re-send all of the previously-requested financial documents.

304. On or about December 22, 2008, Woodard contacted Bank of America, who informed Woodard that they had received her documents, but that there was no program available at the moment.

305. On or about April 10, 2009, Woodard called Bank of America and was told that her file was being reviewed for the Attorney General's loan modification program, and that Woodard needed to send in the loan modification documents; Woodard did so immediately.

306. On or about April 12, 2009, Woodard contacted Bank of America and was informed that Bank of America had received her documents, and that she was definitely approved for the loan modification program.

307. On or about April 24, 2009, Woodard was informed by Bank of America that her file was still being reviewed.

308. On or about May 15, 2009, Woodard contacted Bank of America and once again was told that her file was still being reviewed.

309. On or about June 18, 2009, Woodard was once again told by Bank of America that her file was still in review, but that Woodard would need to provide Bank of America with the loan modification documents again; Woodard provided Bank of America with the requested loan modification documents on or about June 19, 2009.

310. On or about June 23, 2009, Woodard contacted Bank of America representative Ingrid and was told that Bank of America could not find her documents; Woodard re-sent the documentation.

311. On or about June 25, 2009, Woodard called Bank of America to determine if they had received the documents; Bank of America stated they had received everything they needed.

312. On or about August 4, 2009, Woodard spoke with Bank of America representative

Gloria, who informed Woodard that her file was closed as a result of Woodard apparently rejecting an offered loan modification; Woodard had never received a loan modification offer.

313. Woodard called Bank of America again on or about August 7, 2009; Bank of America representative Jim advised Woodard that her file was going to be reviewed again, but that she needed to provide all of the previously-requested documentation once again.

314. Woodard provided all of the requested documentation to Bank of America shortly thereafter; On or about August 11, 2009, Woodard was informed that Bank of America had received all of the requested documentation.

315. However, Woodard called Bank of America once again on or about August 14, 2009 to verify that her file was being reviewed and was told by Bank of America representative Arthur that Woodard would need to re-send the documentation.

316. On or about August 20, 2009, Woodard was told by Bank of America representative Janine that they were not honoring any agreement made with the Attorney General's Office in regards to any loan modification program, and that in fact, no such program existed.

317. On or about September 9, 2009, Woodard was notified that her file was assigned to a new negotiator, Bank of America representative Christopher Maser.

318. On or about September 11, 2009, Woodard received a Notice of Default and Election to Sell.

319. Woodard immediately called Bank of America and inquired as to why she received a Notice of Default when she was supposed to be being reviewed for a loan modification; Bank of America informed Woodard that there was no program for Woodard, but that they were still looking for a possible loan modification.

320. On or about September 22, 2009, Woodard contacted Bank of America once again, and was told that there was no program available for her and that her only option at this point was a full reinstatement.

321. On or about October 2, 2009, Woodard applied for a Foreclosure Mediation, which was established by Nevada Assembly Bill 149.

322. On or about May 4, 2010, Woodard attended the mediation, however, no final resolution was reached; The parties did however, agree to exchange additional documentationadn continue the mediation at a later date.

323. Despite being in the middle of negotiations with Bank of America in regards to obtaining a loan modification, Bank of America proceeded with the foreclosure process.

324. Additionally, Woodard was given conflicting information on numerous occasions from Bank of America representatives in regards to the status of her file, documents being recieved/not recieved, etc.

325. On or about January24, 2007, ROSS WOODARD, purchased the property located at 9700 Dieterich Avenue, Las Vegas, Nevada 89148; The loan number for this property is 022258557. Ross Woodard's loan is currently owned and/or serviced by Bank of America.

326. As a result of the economic downturn, Ross Woodard began having problems keeping up with his monthly mortgage payment.

327. After spending approximately two years attempting to locate who owns/services his loan, Ross Woodard finally discovered that Bank of America owned and/or serviced his loan.

328. Toward the end of 2009 and beginning of 2010, Ross Woodard began contacting Bank of America in regards to obtaining a loan modification; Bank of America requested that Ross Woodard provide them with loan modification and financial documents.

329. On or about March 25, 2011, Ross Woodard provided all of the requested documents to Bank of America.

330. On or about April 7, 2011, Bank of America again requested documentation from Ross Woodard in regards to reviewing his file for a loan modification; This documentation was sent to Bank of America the same day.

331. Despite being in the midst of negotiations with Bank of America regarding obtaining a

1   loan modification, Bank of America has proceeded with the foreclosure process.

2   332. On or about July 18, 2005, TERESA YAMOMO, (hereinafter "Yamomo") purchased the

3   property located at 6045 Marigold Point Court, Las Vegas, Nevada 89120; The loan

4   number for this property is 109538587. Yamomo's loan is currently owned and/or

5   serviced by Bank of America.

6   333. As a result of the economic downturn, and Yamomo's monthly mortgage payment

7   doubling, Yamomo began having difficulty keeping up with her monthly payments.

8   334. Yamomo began contacting Bank of America to discuss a loan modification in or about

9   April 2009.

10  335. Yamomo was told by Bank of America to send the required loan modification

11  documentation to them, and they would review her file.

12  336. On or about November 1, 2010, while in the middle of negotiating with Bank of America

13  regarding a loan modification, Yamomo received a Notice of Default and Election to

14  Sell.

15

16  337. In or about February 2011, Yamomo participated in the state-sponsored mediation

    program with Bank of America, however, no agreement was reached.
17

18  338. Yamomo was notified that her home was to be sold at a Trustee's Sale on April 11, 2011,

19  however after sending the loan modification documents once again, this date was

20  postponed to May 11, 2011.

21  339. Despite Yamomo being in negotiations with Bank of America regarding a loan

22  modification, Bank of America has continued the foreclosure process and set a sale date.

23  **BANK OF AMERICA REPEATEDLY MISREPRESENTED THE TIME FOR MAKING
    DECISIONS ON CONSUMERS' MODIFICATIONS**

24  340. On its website and in its interactions with Plaintiffs, Bank of America repeatedly

25  promised consumers answers on their modification requests within a specific time frame,

26  typically 30 or 60 days. Many consumers have waited 6 months or even a year and still

27  have not received decisions.

28  341. Bank of America's website indicates that it will "typically" take 30 to 45 calendar days

from the receipt of a consumer's documents to make a decision on a loan modification request. In addition, Bank of America promises on its website that: "You can expect to hear back from us within 10 business days from when we receive al your required documents. The purpose of contacting you is to confirm receipt of your information, as well as let you know how the evaluation process works and how long it takes. **See, Exhibit "2".**

342.   Bank of America sent consumers seeking modifications a document with "Frequently Asked Questions" about HAMP. One question asks how long it will take for Bank of America to process consumers' modification request. The answer: "up to 45 days." **See, Exhibit "3".**

343.   These assurances are reinforced in one-on-one conversations between Nevada consumers and Bank of America representatives in which Bank of America promises that consumers will have an answer on their requests within 30, 60, or 90 days.

344.   Bank of America has kept Nevada consumers waiting for 6 months, one year, or longer for a decision. These consumers have suffered delay, anxiety, and often foreclosure while trying to secure an affordable payment that allows them to meet their obligations and keep their homes.

345.   One critical source of delay is Bank of America's routine loss of consumer documents. For some time, HAMP required Bank of America to obtain updated financial information from consumers if the information was more than 90 days old. **See, Exhibit "4".**  As a result, Bank of America's delayed processing of consumers' modifications required them to obtain additional documentation from consumers, which further delayed the processing of their requests and compounded the logistical demands on the Bank. Even beyond this mandated update, Bank of America consistently has lost consumers' documents; causing delays while consumers re-sent - sometimes more than half a dozen times - the same documents. Bank of America has publicly acknowledged "shortcomings" in its document maintenance. **See, Exhibit "5".**  Also upon information

and belief, consumers were denied modifications because of "missing" paperwork that Bank of America had received.

346. Bank of America routinely fails to notify consumers of missing documents. In fact, most consumers found out that their documents were missing or incomplete months after they submitted their modification requests, and only upon calling Bank of America. In many instances, Bank of America told consumers that documents were missing after previously assuring them, often repeatedly, that their files were complete and under review.

347. While waiting for answers, consumers call Bank of America regularly to check on the status of their modifications requests. They are promised calls or letters with updates, which almost never come. Instead, many receive multiple foreclosure-related communications, including collection calls. This long waiting period is not only inconsistent with Bank of America's oral and written commitments to consumers, but extremely trying for homeowners who do not know from day to day whether they will get help or lose their homes.

348. Bank of America knew, or should have known, that its statements were false because employees were aware that consumers often suffer wait times of more than three months while waiting for action on their modification requests.

**BANK OF AMERICA ASSURED CONSUMERS THAT IT WOULD NOT FORECLOSE WHILE THEIR MODIFICATIONS WERE PENDING, BUT SOLD THEIR HOMES ANYWAY**

349. As noted above, consumers waiting for decisions on their modifications often receive foreclosure-related notices. Upon receiving these communications, many consumers call the number provided by Bank of America on the notices to find out what they mean. Bank of America has repeatedly and deceptively assured Nevada consumers that they should not worry, their modifications are still in review, and their homes will not be sold while their modification requests were pending.

350. This promise is reinforced by commitments on Bank of America's website. Under "Frequently Asked Questions," Bank of America represents to homeowners that their

1    homes will not be sold while they are awaiting decisions on their modification requests

2    or on modification plans:

3        I want to try to get a home loan modification under the Making Home Affordable
         program, but I'm afraid that my lender will go ahead with the foreclosure while
4        I'm trying to make it happen. Can I get more time to explore this option?

5        Yes. While we review your eligibility for the program, your loan will not go to
         foreclosure sale. When you enter a trial plan under the program, your loan will
6        not be referred to foreclosure, and any pending foreclosure proceeding will not go
7        to sale. **See, Exhibits "6-8"**.

8    351.  Despite these assurances, Bank of America has pursued and completed foreclosures

9        while homeowners were awaiting decisions upon loan modifications or on trial

10       modification plans. In other cases, homeowners incurred foreclosure fees, even though

11       the foreclosure process should never have started or proceeded.

12   352.  Bank of America knew, or should have known, that its statements were false and

13       misleading. Its employees regularly encountered consumers whose homes were

14       wrongfully foreclosed while their modifications were still under review. As noted above,

15       interviews with former Bank of America call center employees indicate that foreclosures

16       were continuing while consumers were awaiting decisions on their modifications.

17       **BANK OF AMERICA TOLD CONSUMERS THAT THEY MUST BE BEHIND ON
         THEIR MORTGAGES TO QUALIFY FOR MODIFICATIONS, THOUGH
18       DELINQUENCY IS NOT REQUIRED**

19   353.  Bank of America represents publicly, and federal rules require, that consumers need not

20       be delinquent to be eligible for a modification.

21   354.  Bank of America's website notes: "If you've suffered a hardship that is affecting your

22       ability to make your mortgage payments or have already missed a payment, you may be

23       able to receive a more affordable mortgage payment under the Home Affordable

24       Modification Program." **See, Exhibits "9-10"**.

25   355.  Yet Bank of America representatives frequently advised consumers that they must miss

26       payments in order to be considered for loan modifications. Upon information and belief,

27       many consumers received a letter advising that one of the guidelines under the HAMP

28       program requires the loan be 60 days delinquent. This letter - likely a form document -

1    was inaccurate and deceptive; HAMP never required a loan to be delinquent in order to

2    be eligible for a modification.

3  356.    These misrepresentations regarding the requirements of HAMP violate the Nevada

4    Deceptive Trade Practices Act.

5  **BANK OF AMERICA MISREPRESENTED TO CONSUMERS THAT THEIR TRIAL
   MODIFICATIONS WOULD BE CONVERTED TO PERMANENT MODIFICATIONS IF
6    THEY MADE THEIR TRIAL PAYMENTS**

7  357.    HAMP sets up a two tier framework. Borrowers first must qualify for an initial, three-

8    month trial modification. Consumers who make each of the three payments on time will

9    receive permanent modifications.

10  358.    Bank of America has made unequivocal promises that consumers who successfully

11    complete trial plans would receive permanent modifications. For example, its website

12    announced:

13    a.    "If you successfully make all your Trial Period Plan payments, you will receive a

14        Modification Agreement defining the changes. After this document has been

15        signed, notarized and returned to us, your modification will be officially made

16        permanent." **See, Exhibits "11-12".**

17

18    b.    "If you successfully make your Trial Period Plan payments during the trial period,

19        you will be approved for a permanent modification of your loan." **See, Exhibit**

20        **"13".**

21  359.    In addition, Bank of America led consumers to believe that it would convert them to

22    permanent modifications after three or four months on a trial period. Consumers received

23    three payment coupons with their modification agreement, and report being confused

24    about what to do when they reach the fourth month but have not heard from Bank of

25    America. Some consumers called the Bank and were told at that time, or were told at the

26    time the trial modification was offered, that they will receive a permanent modification

27    within a month of completing their trial periods.

28  360.    Bank of America's website again confirms its oral representations: "Your trial period

1   will last 3 or 4 months, depending on your circumstances." **See, Exhibit "14".** Bank of

2   America certainly did not advise consumers that they would wait six months or more.

3   361.   Bank of America's trial modification offer assures consumers, "[i]f you make all of your

4   trial period plan payments ... and return any additional documents that may be required,

5   you may receive a Modification Agreement."

6   362.   Bank of America knew, or should have known, that its promise that consumers who

7   made their trial payments would be converted to permanent modifications was deceptive

8   as it knew the significant number of consumers with trial modifications that were never

9   made permanent. Bank of America also tracked the "age" of trial periods, and knew that

10   many consumers waited more than four (or even six) months for their modifications to be

11   made permanent (or declined).

12   363.   Though consumers benefit from temporarily lower payments during their trial

13   modification, consumers who are not converted to a permanent modification may end up

14   worse off. In his October 2010 report, the Inspector General of the Troubled Assets

15   Relief Program, which oversees HAMP, discussed the fat of borrowers in failed trial

16   modifications who "even in circumstances where they never missed a payment, ... may

17   face back payments, penalties, and even late fees that suddenly become due on their

18   'modified' mortgages and that they are unable to pay, thus resulting in the very loss of

19   their homes that HAMP is meant to prevent."

20

21   **BANK OF AMERICA MISREPRESENTED THE BASIS FOR DENYING CONSUMERS' MODIFICATIONS**

22   364.   Bank of America told consumers, by letter and often by phone, the reasons that their

23   requests for modifications were denied. Among the commonly cited reasons for denying

24   Nevada consumers' applications were:

25   a.   Investor denial: the owner of the loan with authority to approve the modification

26   would not permit the modification;

27   b.   Inability to reach the consumer or to obtain missing documents needed to review

28   the request;

       c.     Previous modification;

       d.     Consumer's income insufficient to support the modified payment;

       e.     Failure to make trial payments or to accept previous modification; and

       f.     Current on mortgage payments.

365.    Upon information and belief, in many cases, the reasons offered by Bank of America for denying modifications were inaccurate and misleading. In some cases, Bank of America claimed that it was missing documents, even though consumers had repeatedly sent in their documents and/or were told by Bank of America that their files were complete and being reviewed for modifications.

366.    As noted above, Bank of America's authority to offer modifications is defined by the Pooling and Servicing Agreement ("PSA") that governs the servicing of specific pools of loans. In some instances, the investor or owner of the loans delegates to Bank of America full authority to make modification decisions consistent with the investor's best interest. Under some PSAs, only certain types of loans can be modified or certain types of modifications made. Other investors do not permit modifications or require Bank of America to seek approval before offering modifications.

367.    Upon information and belief, Bank of America notified consumers that their modifications were declined by the investors in instances where Bank of America had full authority, without the investors' approval, to offer modifications.

368.    In some instances, Bank of America turned away consumers on the grounds that the consumer had failed to make payments during the trial modification when, in fact, the consumers had made all of the trial payments. These denials directly contradict Bank of America's repeated promises on its website that consumers who make their trial plan payments <u>will</u> receive permanent modifications.

**BANK OF AMERICA MISLED CONSUMERS BY INDICATING THAT THEY HAD BEEN APPROVED FOR MODIFICATION AND BY OFFERING CONSUMERS MODIFICATIONS ON DIFFERENT TERMS THAN PROMISED**

369.    For consumers who were able to secure modification commitments, Bank of America

misrepresented whether and on what terms their modification requests had been approved.

370.  Bank of America told consumers that their modifications had been approved, but then notified them that they had never received modifications. Often, this news cam only after consumers had made several payments on trial modifications.

371.  Nev. Rev. Stat. § 107.086, passed by the Nevada Legislature on May 22, 2009, allows homeowners who receive Notices of Default to participate in a pre-foreclosure mediation with their servicers. If a homeowner sends in the required election form, the servicer must appear at an assigned mediation date with all required documents and the authority to negotiate an appropriate agreement with the borrower. Participation in good faith in the mediation is prerequisite to moving forward with the foreclosure.

372.  Often, Bank of America representatives did not show up at assigned mediation dates, or did not have the documents or negotiating authority required by law. As a result, in a number of instances, mediators issued findings that Bank of America had acted in bad faith.

373.  In addition, a number of consumers were promised modifications on a set of terms worked out with (and witnessed by) the mediators, but were eventually given a modification on completely different terms.

374.  Bank of America's promises of modifications, which it failed to provide, constitutes a deceptive practice.

**FIRST CAUSE OF ACTION**
*Violations of Nevada Deceptive Trade Practices*

375.  Plaintiffs hereby incorporate and re-allege every allegation contained in this Complaint and further alleges as follows:

376.  Bank of America's misrepresentations to Plaintiffs, and in fact, Nevada consumers as a whole, regarding the operation of its mortgage modification practice violates the Nevada Deceptive Practices Act.

377.  In particular  Bank of America's deceptive conduct breached its obligations under:

a. Nev. Rev. Stat. § 598.0915(9), which provides that it is a deceptive practice for a person to "[a]dvertise[] goods or services with the intent not to sell or lease them as advertised;"

b. Nev. Rev. Stat. § 598.0915(15), making it a deceptive trade practice for a person to "[k]nowingly make[] any other false representation in a transaction;"

c. Nev. Rev. Stat. § 598.092(8), which declares that it is a deceptive trade practice for a person to "[k]nowingly misrepresent[] the legal rights, obligations, or remedies of a party to a transaction;" and

d. Nev. Rev. Stat. § 598.0973, allowing a court to impose heightened penalties for "engage[ing] in a deceptive trade practice directed toward an elderly person or a person with a disability."

378. As alleged herein, Bank of America engaged in unlawful practices in violation of the Nevada Deceptive Trade Practices Act §§ 598, *et seq.*, in that it made false promises and used deception, deceptive practices, and/or misrepresentations in connection with mortgage modifications.

379. That as a result of Defendant's actions, Plaintiffs have been damaged in excess of $10,000.00.

380. In all matters alleged herein, the Defendants acted willfully in violation of Nev. Rev. Stat. §§ 598, *et seq.*, as required by Nev. Rev. Stat. § 598.0999(2).

381. As such, Plaintiffs are entitled to recover punitive damages in an amount to be determined at trial.

382. The Plaintiffs have been required to retain the services of Callister + Associates to prosecute this action, and Plaintiffs are therefore entitled to recover their reasonable attorney's fees and costs of court for having to bring this action.

## SECOND CAUSE OF ACTION
### *(Injunctive Relief)*

383. Plaintiffs hereby incorporate and re-allege every allegation contained in this Complaint and further alleges as follows:

384. Plaintiffs' properties face foreclosure as a result of Defendants violation of the Nevada Deceptive Trade Practices Act.

385. A Court Order is necessary to prevent the foreclosure of Plaintiffs' property and/or eviction proceedings or otherwise altering the nature and state of Plaintiffs' status quo of their residences.

386. Federal Home Loan Mortgage Corporation is a necessary and indispensable party because they unfortunately purchased Nguyen's property which was wrongfully foreclosed upon by Bank of America.

387. The Plaintiffs have been required to retain the services of Callister + Associates to prosecute this action, and Plaintiffs are therefore entitled to recover their reasonable attorney's fees and costs of court for having to bring this action.

## THIRD CAUSE OF ACTION
### *(Promissory Estoppel)*

388. Plaintiffs hereby incorporate and re-allege every allegation contained in this Complaint and further alleges as follows:

389. Defendants promised in writing and verbally that Defendants would not proceed with the foreclosure process while Plaintiffs were in negotiations with Defendants in regards to a loan modification.

390. Defendants should have reasonably expected that Plaintiffs would rely upon Defendants' promises.

391. Plaintiffs, in good faith, detrimentally relied on Defendants' promises by forgoing other options and remedies in regards to their mortgage.

392. Defendants were aware of Plaintiffs above described acts of detriment.

393. Plaintiffs were justifiable in their reliance on Defendants' promises.

394. Injustice can only be avoided by enforcement of the promise.

395. The Plaintiffs have been required to retain the services of Callister + Associates to prosecute this action, and Plaintiffs are therefore entitled to recover their reasonable attorney's fees and costs of court for having to bring this action.

**WHEREFORE**, Plaintiffs pray for relief and damages as follows:

1.  For a Declaratory Judgment that the Defendant's operation of its loan modification program has violated the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. §§ 598, *et seq.*;

2.  That Plaintiffs be awarded actual damages in excess of $10,000.00;

3.  That Plaintiffs be awarded punitive damages in excess of $10,000.00;

4.  That Plaintiffs be awarded reasonable attorney's fees;

5.  That Plaintiffs be awarded their costs of Court;

6.  That injunctive relief be awarded, enjoining Defendants from foreclosure, recording of the deed of trust and/or eviction proceedings against Plaintiffs; and

7.  That Plaintiffs be awarded any other relief as the Court may deem proper.

DATED:  This 29th day of April, 2011.

Respectfully submitted,

**CALLISTER + ASSOCIATES, LLC**

By: _____ #11920 for:
**MATTHEW Q. CALLISTER, ESQ.**
Nevada Bar No. 001396
823 Las Vegas Blvd. South, 5th Floor
Las Vegas, NV 89101
*Attorneys for Plaintiffs*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the Law Firm of Callister + Associates, LLC, and not a party to nor interested in the within matter; that on the 29 day of April, 2011, service of the **FIRST AMENDED CLASS ACTION COMPLAINT** was made by:

XX     by serving the following parties electronically through CM/ECF as set forth below;

☐     by faxing a copy to the numbers below;

☐     or by depositing a copy in the United States Mail postage prepaid to the parties listed below:

Ariel E. Stern, Esq.
Jacob D. Bundick, Esq.
Akerman Senterfitt, LLP
400 South Fourth Street
Suite 450
Las Vegas, NV 89101
702-634-5000
Fax: 702-380-8572
Attorneys for Defendants

An Employee of Callister + Associates